[Cite as *State ex rel. Attorney General v. Hamm*, 2026-Ohio-2304.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO, EX REL. ATTORNEY :     APPEAL NO.    C-240137
GENERAL,                                      TRIAL NO.      A-1902927

     Plaintiff-Appellee,    :

     vs.    :

LISA HAMM, et al.,    :                 *JUDGMENT ENTRY*

     Defendants,    :

     and    :

STEPHANIE MILLARD,    :

     Defendant-Appellant/Third-Party    :
     Plaintiff-Appellant,

     vs.    :

CINCINNATI COLLEGE
PREPARATORY ACADEMY,    :

     Third-Party Defendant-Appellee.    :

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

# OHIO FIRST DISTRICT COURT OF APPEALS

**To the clerk:**

**Enter upon the journal of the court on 6/18/2026 per order of the court.**


**By:**_____
        **Administrative Judge**

[Cite as *State ex rel. Attorney General v. Hamm*, 2026-Ohio-2304.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, EX REL. ATTORNEY GENERAL, | : | APPEAL NO. C-240137<br>TRIAL NO. A-1902927 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| LISA HAMM, et al., | : | *O P I N I O N* |
| Defendants, | : | |
| and | : | |
| STEPHANIE MILLARD, | : | |
| Defendant-Appellant/Third-Party Plaintiff-Appellant, | : | |
| vs. | : | |
| CINCINNATI COLLEGE PREPARATORY ACADEMY, | : | |
| Third-Party Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 18, 2026

*Dave Yost*, Attorney General of Ohio, and *L. Martin Cordero* and *Christie Limbert*, Assistant Attorneys General, for Plaintiff-Appellee,

*Jeffrey A. Burd,* for Defendant-Appellant/Third-Party Plaintiff-Appellant Stephanie Millard,

*Dickinson Wright, PLLC, Jonathan R. Secrest* and *Chelsea L. Canaday,* for Third-Party Defendant-Appellee Cincinnati College Preparatory Academy.

**BOCK, Judge.**

{¶1} Once again, we are confronted with community-school administrators who "squandered" public funds to enrich themselves at the expense of "the lives of countless children, often from disadvantaged backgrounds." *See Sun Bldg. Ltd. Partnership v. Value Learning & Teaching Academy*, 2021-Ohio-2008, ¶ 1 (1st Dist.). In this appeal, a jury agreed with the state auditor and plaintiff-appellee State of Ohio, ex rel. Attorney General Dave Yost ("State") and found defendant/third-party-plaintiff-appellant Stephanie Millard jointly liable for $392,847 in public funds misappropriated during Millard's tenure as third-party-defendant-appellee Cincinnati College Preparatory Academy's ("CCPA") fiscal officer.

{¶2} On appeal, Millard assigns six errors to the trial court's decisions involving immunity, statute of limitations, validity of the state auditor's audit procedures, admitting Millard's expunged conviction as evidence at her trial, and her proposed jury instructions. Unconvinced, we overrule her assignments of error.

{¶3} First, we hold that R.C. 3313.25(B), which shields from liability treasurers of a school district board of education, does not apply to Millard's tenure at a community school. Second, we hold that R.C. 2305.07's six-year statute of limitations did not bar the State's claims. Third, Millard opened the door to the admission of otherwise inadmissible evidence of her expunged convictions when she claimed, in her opening statement, that the prosecutor never pursued criminal charges against her. Fourth, we hold that the trial court acted within its discretion by rejecting Millard's proposed jury instructions, which were not concise, clear, or complete.

{¶4} Finally, while the trial court erred by allowing an employee of the state auditor's office to give lay-witness testimony about community-school funding, the error was harmless because other evidence in the record established the same facts.

{¶5} Therefore, we affirm the trial court's judgment.

## I. Factual and Procedural History

{¶6} CCPA opened its doors in 1999 as a private nonprofit corporation to provide "top educational opportunities and assistance" to students in the community. From 2005 to 2013, Millard served as the "designated fiscal officer" for CCPA, though her contract identifies her as both the "treasurer" and a "consultant." Millard's tenure coincided with the tail end of defendant Lisa Hamm's time as CCPA's superintendent.

## A. State audits revealed abuse of public funds and private expenditures

### 1. The special audit

{¶7} In 2009, the state auditor received an anonymous tip of credit card abuse by Hamm, which triggered a special audit of CCPA's credit card transactions between 2006 and 2010. When the state auditor uncovered a plethora of "questionable" transactions, he expanded the scope of the investigation to nonpayroll expenditures unrelated to CCPA's operations and employee compensation.

{¶8} In 2013, the state auditor issued a special audit report that included more than 29 findings for recovery totaling $517,424 in misappropriated public funds from 2006 to 2010. The state auditor considered Hamm and Millard accountable as CCPA's "chief executive and chief financial officer responsible for ensuring appropriate use of CCPA funds."

{¶9} The state auditor found that some purchases amounted to an abuse of public funds as defined by the Government Accountability Office's 2007 Generally Accepted Government Auditing Standards, § 4.12. Specifically, the state auditor found that a prudent person would not consider it reasonable for CCPA to have spent more than $60,000 in Christmas bonuses and gifts during the special audit period, which were in addition to "staff tribute expenses" approved by the CCPA Board "in 2007,

2009, and 2010 ranging from $35,000 to $50,000 [to purchase] i-pods, i-phones, Digital cameras, jewelry, gift certificates, and other gifts." And CCPA made similar purchases in 2008 *without* CCPA Board approval. Other abuses of public funds included $30,000 for a one-day administrative retreat and conference, more than $14,000 for an unapproved three-week staff-development event that included paintball and laser tag, travel expenses that were not approved by the CCPA Board, and $1,150 in sports memorabilia purchased from a CCPA Board member.

{¶10} According to the state auditor, CCPA misappropriated those funds because the expenses lacked a public purpose. The special audit explained that, because CCPA's Code of Regulations ("CCPA Code") lacked a policy defining a proper public purpose for expenditures, the state auditor considered whether CCPA spent public funds in a manner that "promote[d] the goals or mission of CCPA or work to achieve such goals." For example, the auditor considered the following purchases as untethered from the CCPA mission, goals, and work:

- Entertainment such as theatre shows, concerts, sporting event[s], cruises, and costs with such events.
- Clothing.
- Individual drinks and snacks not associated with a meal.
- Magazines and personal hygiene items.
- Gift shop items.
- Laundry and dry cleaning.
- Alcohol.

{¶11} The state auditor tallied $340,000 of credit card charges that lacked a public purpose. For the sake of brevity, we summarize those findings as follows:

| TYPE | AMOUNT | FINDING |
| --- | --- | --- |
| Conference Trips | $53,888 | "[N]ot approved by the governing board or did not provide professional development for the employees' position at CCPA, [] individuals not actually attending the conference, and [] expenses considered not a proper public purpose." |

| | | |
|---|---|---|
| Best Practices Trips | $20,530 | "[U]nauthorized 'Best Practices' trips, [] a non-CCPA employee attending a trip, and [] expenses considered to not be a proper public purpose." |
| Residency Trips | $30,966 | Trips "were not approved by the governing board," a "family member accompanying [the principal]," and "expenses considered to not be a proper public purpose." |
| Residency Trip to Spain | $9,714 | Three CCPA employees attended without board approval. |
| Residency Trip to England | $922 | "Millard charged expenses for food, entertainment, lodging, and other miscellaneous items" without CCPA Board approval. |
| New York City Student Tour | $11,741 | Expenses not approved by CCPA Board, staff family members attended, and cash withdrawals. |
| Staff and Student Field Trips and Outings | $69,542 | Not approved by CCPA Board, expenses were not associated with the outing, a limited number of staff attended, or merchandise and souvenirs. |
| Staff and Student Incentives | $61,345 | Incentives not approved or exceeded the approved amount. |
| Meals | $27,822 | Meals purchased outside of school hours and events. |
| Fuel for Hamm's Vehicle | $399 | Date and location of the purchases. |
| Medical Expenses | $2,283 | Services not covered by CCPA insurance policy, such as immunizations, dermatology, holistic wellness products and services, spa services, and prescription eyeglasses. |
| Miscellaneous Expenses | $47,813 | Expenses not approved by CCPA Board or authorized under a CCPA policy for various items like weight-loss supplements, pet products, frozen meat delivered to Hamm's residence, religious-themed materials and "a lifetime membership to a religious themed museum." |
| Doctoral Program Tuition | $31,890 | Exceeded tuition expenses approved by CCPA Board. |
| Doctoral Program Expenses | $6,177 | Unapproved expenses for textbooks, editing service, and dissertation publishing for Hamm's doctoral program. |
| Lawncare and Periodicals for Hamm | $1,642 | Unrelated to CCPA operations. |
| Payments of City Church's Expenses | $1,489 | Equipment rental, food, telephone service, and banners purchased for "City Church International," a religious nonprofit corporation associated with Hamm. |

**{¶12}** The state auditor also found $164,247 in nonpayroll disbursements, by check or electronic withdrawal, that lacked a public purpose:

7

| TYPE | AMOUNT | FINDING |
|---|---|---|
| Insurance Benefits | $35,108 | Insurance benefits for independent contractors, including Millard, violating the CCPA Code. |
| Legal Fees of Other Private Entities | $2,207 | "CCPA paid legal fees totaling $2,207 for private legal entities associated with Lisa Hamm and unrelated to CCPA operations." |
| Donations | $3,000 | Not approved by CCPA Board. |
| Property Taxes | $26,259 | CCPA paid commercial property taxes for a "private legal entity unrelated to the operations of CCPA, of which Lisa Hamm is president." |
| ROAR Education | $3,323 | CCPA paid for the development and maintenance of the website for ROAR Education, "a corporation associated with Lisa Hamm operated for the purposes of providing instruction and training." |
| Food Services | $8,500 | Amount exceeded the contract executed by CCPA with the catering company. |
| Memberships | $19,285 | YMCA and AAA memberships for non-leadership employees without CCPA Board approval and in violation of the CCPA Code. |
| Season Tickets | $19,182 | Bengals, Broadway, concert, and other tickets that either were not approved by CCPA Board or approved as a staff incentive but used by "executive level administration and [] not CCPA teachers." |
| Hamm's Father's Medical Expenses | $632 | Medical expenses were not approved by the CCPA Board or CCPA Code. |
| Cash Withdrawals | $2,349 | No documentation. |
| Utility Payments for Tenants | $3,912 | CCPA paid utilities for commercial tenants of Hamm's private not-for-profit corporation. |

**{¶13}** Finally, $12,377 in payroll disbursements lacked a public purpose as some employees were paid more than their contract allowed and Millard received $400 in Christmas bonuses not authorized by her contract or the CCPA Board.

2. Yearly audits: 2010-2013

**{¶14}** In June and July 2013, the state auditor issued separate audit reports for CCPA's 2009-2010 and 2010-2011 school years. In the 2010 audit, the state auditor made findings for recovery of $8,307 in overcompensation paid to Millard and $8,495 that Hamm spent on Cincinnati Bengals tickets, steakhouses, and other "entertainment, recreation, and personal items" for CCPA staff. In the 2011 audit, the

8

state auditor made findings for recovery of $5,275 in unapproved compensation paid to the CCPA principal, $1,218 and $1,313 in overcompensation to two employees, and $37,604 spent by Hamm on entertainment without CCPA Board approval.

{¶15} In February 2014, the state auditor issued an audit of CCPA's 2011-2012 school year. The state auditor made findings for recovery of $32,518 that Hamm improperly spent on recreation, entertainment, trips, and personal items for CCPA staff; $40,517 in reimbursements paid to Hamm without CCPA Board approval; $4,225 paid by checks signed by Millard to vendors that lacked documentation or invoices; and for $7,078 in overcompensation paid to four staff members.

{¶16} Finally, in April 2015, the state auditor published its audit of CCPA's 2012-2013 school year. Relevant here, the 2013 audit included findings for recovery of $4,224 reimbursed to Hamm without CCPA Board approval, $10,616 paid into Hamm's state retirement account without CCPA Board approval, and $1,269 spent on repairs to Hamm's personal vehicle.

**B. The State sued Hamm, Millard, and others to recover the funds**

{¶17} In 2019, the State sued Millard, Hamm, and other CCPA employees to recover the misappropriated funds from Millard, jointly and severally with Hamm and other CCPA employees as codefendants. In an amended complaint, the State sought to reduce the findings for recovery in the audits to a monetary judgment of more than $550,000 against Millard under R.C. 117.28 and 117.30 in Count 1. In Count 2, the State sought to recover that figure under a theory of strict liability for public funds under R.C. 9.39. Millard answered and filed a third-party complaint against CCPA to enforce the indemnification provisions in the CCPA Code.

**C. Pretrial motions**

1. <u>Motions for judgment on the pleadings and summary judgment</u>

**{¶18}** In July 2021, the State moved for partial summary judgment against Millard and her codefendants on its claims for recovery of the funds under R.C. 117.28. In response, Millard moved for summary judgment and argued that the State's claims, based on the special audit report, were barred by the statute of limitations and that the special audit was improperly conducted under R.C. 1711.11.

**{¶19}** The next month, Millard moved for a judgment on the pleadings, claiming that R.C. 3313.25(B)(1) shielded her, as a treasurer, from liability.

**{¶20}** In a June 2023 order, the trial court denied the summary-judgment motions and Millard's motion for judgment on the pleadings. It found that R.C. 3313.25(B)(1) applied to Millard, but the State had the burden of proving that Millard's acts were negligent or wrongful. Millard moved for reconsideration of the trial court's denial of her motion for judgment on the pleadings. After the case was assigned to a visiting judge, the trial court denied Millard's motion for reconsideration because "R.C. 3313.25(B)(1) does not apply to fiscal officers of community schools."

2. <u>Motions in limine</u>

   i.   *Millard's expunged records*

**{¶21}** In 2019, the State and Millard informed the trial court that Millard planned to move to dismiss the complaint based on "materials that have been sealed pursuant to R.C. 2953.32." The trial court ordered that any filings and exhibits related to the sealed materials be filed under seal and prohibited the parties from disclosing "to any third party except upon Court Order permitting such disclosure." Shortly before trial, Millard moved "for an Order in limine preventing Plaintiff or CCPA from introducing any evidence or testimony subject to the Confidentiality Order."

**{¶22}** Meanwhile, CCPA filed a motion asking the trial court to take judicial notice of this court's "judicial findings" in *Millard v. Accountancy Bd. of Ohio*, 2017-Ohio-7677 (1st Dist.). There, we affirmed the accountancy board's disciplinary decision and recounted that, after reaching a plea agreement with the State, Millard had been convicted of misdemeanor offenses related to her tenure at CCPA. *Id.* at ¶ 21. At a hearing, Millard explained that her convictions had been expunged.

**{¶23}** The trial court denied Millard's motion in limine and ruled that evidence of her convictions "might very well be admissible" regarding the "indemnification issue" but inadmissible "for some other reason." It granted CCPA's motion and took judicial notice of this court's opinion in *Millard*.

### ii. *Expert testimony*

**{¶24}** Millard, the State, and CCPA all filed motions in limine to prevent certain expert testimony. Relevant here, Millard moved to prevent the State and CCPA "from introducing any expert testimony during trial," particularly Richard D. Blakesley's expert testimony, because both the State and CCPA had failed to comply with the trial court's discovery schedule. After a hearing on that motion, the trial court granted the motion in limine, in part, and limited Blakesley's testimony to "his findings in the [Auditor's report], and why he did A, B, and C, and why he concluded that this was illegal." But Blakesley could not testify about others' actions.

## D. Millard's trial

### 1. Opening Statements

**{¶25}** In her opening statement, Millard asked the jury to view the case as the State's attempt to blame her for others' misconduct and invited the jury to infer her innocence from the State's inaction:

Here's the laws of the State of Ohio. What law did they break? [The State] can't find any law that you broke. . . . [The State] can't point to any regulations or any laws that were broken. . . . *No wonder the prosecutor passed*. . . . They are trying to hold her liable for checks her boss wrote for things.

(Emphasis added.)

**{¶26}** In its opening statement, CCPA responded to Millard's remarks:

CCPA: One thing I do want to correct, [in Millard's] opening statement, that [Millard's counsel] said the Prosecutor passed.

MILLARD: Objection.

. . .

COURT: Overruled.

CCPA: You will hear evidence later on that that's not the case at all.

2. <u>The State's case</u>

**{¶27}** At Millard's trial, the State relied on the results of the special and yearly audits, the CCPA Code and staff handbook, financial records obtained during its audit of CCPA, the state auditor's investigatory work product, and testimony from Blakesley and other state officials.

**{¶28}** Blakesley worked for the state auditor as a senior forensic audit manager, was a certified fraud examiner, and was part of the team that conducted the special audit. During the special audit process, Blakesley and other auditors compared CCPA's financial records with its governing policies to assess CCPA's compliance with Ohio law. As part of the special and yearly audits, the office created guidelines to determine whether expenses were for a public purpose. The special and yearly audit

reports state that the audits were "conducted in accordance with the Quality Standards for Inspections established by the President's Council on Integrity and Efficiency."

**{¶29}** The audit team uncovered issues surrounding CCPA's financial records and school policies. For instance, staff handbooks found in Hamm's and Millard's offices lacked the board-approved credit card and invoicing policies. Initially, Blakesley could not say if the audit team relied on a draft of the CCPA Code. But later, he clarified that the audit team relied on the staff handbook approved by the CCPA Board in 2006 and CCPA's 2007 contract with its sponsor.

**{¶30}** During its review of CCPA's finances, the audit team noticed changes to CCPA's digital financial records. Over an objection, Blakesley reviewed a criminal investigation summary authored by an investigator for the state auditor that described 2014 interviews with Hamm and Millard in which Blakesley participated. Millard told interviewers that Hamm directed her and others to change class codes in CCPA's accounting software to reflect "certain revenues and expenditures" based on "the criminal investigative summaries provided by the [auditor]."

**{¶31}** Blakesley also recounted the "noticeable discrepancies" in CCPA receipts and other financial documents. Some receipts were missing altogether, while other financial records consisted of "no-detail receipts" that prevented the audit team from "determin[ing] what was actually being purchased." For instance, Hamm, Millard, and other staff members traveled to California. In her interview, Millard recalled attending that trip as a "perk" of her position at CCPA, a trip that she believed served no benefit to CCPA. Millard explained that Hamm used CCPA funds to buy personal items like clothes for her nieces, and pressured Millard to turn a blind eye.

**{¶32}** Due to the volume of transactions, the audit team categorized each expense and developed guidelines for determining whether expenses were made for a

13

"public purpose" versus expenses that were made for a "non-public purpose." Blakesley discussed the findings for recovery in depth and agreed that some findings for recovery were based on the absence of a policy in the CCPA Code or CCPA Board approval, even though the guidelines stated that lack of CCPA Board approval did not, on its own, justify a finding for recovery.

{¶33} For instance, CCPA paid for Hamm and other employees to take "best practices" trips around the country to observe the operations of successful schools. On a best-practices trip to Chicago, Hamm and others attended a Tina Turner concert instead of visiting the school. Hamm and others also enjoyed multiple Broadway shows during an unapproved best-practices trip to New York City.

{¶34} Hamm and Guyton Matthews, the CCPA principal, enrolled in a doctorate program at Waldon University. The CCPA Board approved a fixed amount of CCPA funds for tuition and travel expenses for "residency" trips for Hamm and Matthews as part of that program. But without CCPA Board approval, public funds were used for two additional staff members and Matthews's son to travel to Spain with Hamm and Matthews. And while the CCPA Board approved the residency trip to Madrid, they took an unapproved detour to Barcelona that cost $9,714. During a residency trip to Los Angeles, Hamm spent public funds on Los Angeles Lakers tickets.

{¶35} Turning to student and staff outings, the special audit revealed that CCPA spent $69,542 on expenses during student and staff outings that lacked a public purpose between 2007 and 2010. Some expenses were not approved by the CCPA Board, others consisted of purchases of merchandise like compact discs and t-shirts during those outings. Hamm and others frequented a steakhouse before "Broadway Across America" shows from 2006 to 2009, often spending thousands of dollars on food and drinks in a single night. The state auditor presented a photograph of Hamm

and four other CCPA staff at a production of Legally Blonde without "any student or juveniles observed in the seats purchased by CCPA." Around that time, Hamm, Millard, and another administrator used public funds on Carrie Underwood tickets.

**{¶36}** Other expenses that lacked a public purpose included gasoline, insurance, and maintenance for Hamm's personal vehicle. There was also $2,283 spent on immunizations, copays, dental services, spa services, and prescription glasses for Hamm that were not covered by the CCPA insurance plan. Hamm used $1,642 of school funds to pay for newspaper subscriptions and landscaping at her house. Blakesley and his team also discovered $1,489 worth of purchases on behalf of "an entity called City Church," which is "affiliated with [] Hamm."

**{¶37}** Shelly Goodrich, a senior assistant attorney general and CPA, testified that her office had received payments to resolve some of the findings for recovery, so her office reduced the findings for recovery in the complaint.

**{¶38}** At the close of the State's case, Millard moved for a directed verdict. She argued that she was immune as CCPA's "treasurer" and there was no evidence of negligence or wrongful acts on her part. And she claimed that the State did not produce evidence that "any public funds [were] involved." The trial court denied her motion.

3. Millard's defense

   i. *Millard's testimony*

**{¶39}** Millard testified in her defense and support of her counterclaim that Hamm recruited Millard to work at CCPA and she agreed in 2021 to "handle [CCPA's] financial reporting and tax returns" if someone else handled "payroll and accounts payable." At one point, Millard was working with "eight charter schools." Millard's 2004-2005 contract states that she worked 12 hours a week and under the direction of Hamm. Millard was "touched" by CCPA's work and agreed to take a pay cut in

15

exchange for health benefits provided by contract. In December 2006, Millard was appointed to the CCPA Board's executive committee "to review the financial reports, and the state of affairs, contracts, stipends, spend and other financial matters."

{¶40} Millard posted a treasurer's bond as required by statute. But according to Millard, Hamm did not give Millard general supervisory authority over CCPA's finances. While Millard had access to and was a signatory on CCPA's financial accounts, she lacked decision-making authority over CCPA's finances. Millard disagreed that she was CCPA's financial "gatekeeper." Instead, she testified that Hamm had final say over CCPA finances and would refuse to pay vendors "if [Hamm] didn't like something the school was being billed for." Millard also denied handling CCPA's credit card accounts or payroll.

{¶41} Rather, Millard insisted that she was simply responsible for "financial reporting" and fulfilling the CCPA Board's and Hamm's wishes. Specifically, she was tasked with keeping a proper book of accounts, with keeping an accurate accounting of CCPA's finances, and with presenting financial statements to the CCPA Board. Millard also prepared financial forecasts for the Ohio Department of Education ("ODE") and prepared CCPA's taxes. Millard discussed how she had secured millions of dollars in grant money for CCPA during her tenure at the school.

{¶42} Millard disputed the state auditor's conclusion that some public funds were spent without a public purpose. For instance, she testified that gifts were purchased for staff members using money collected from the staff. And she explained that the staff incentives were intentional and designed to address the high rate of staff turnover at the school. She also testified that while findings for recovery were made for merchandise purchased for Hamm's relatives, Hamm collected money from her relatives to reimburse the school.

**{¶43}** CCPA ended Millard's employment in 2013 before the state auditor had released its special audit report. Millard testified that the CCPA Board fired her because "it was looking like the State was going to allege some criminal charges." Millard also testified about her CPA license. When asked if the Ohio Accountancy Board brought an action to revoke her CPA license based on her "dishonest and fraudulent" conduct while employed by CCPA, she replied, "No."

**{¶44}** CCPA impeached Millard with this court's opinion in *Millard*, which affirmed the Accountancy Board of Ohio's revocation of her CPA certificate. *Millard*, 2017-Ohio-7677, at ¶ 1 (1st Dist.). In *Millard,* we held that "[e]vidence that Millard had been convicted of two offenses of unauthorized use of property was sufficient to support the accountancy board's disciplinary action . . . because the offenses involved elements of dishonesty or fraud." *Id.*

**{¶45}** Millard agreed that our opinion in *Millard* accurately recounted how she pleaded guilty to two counts of unauthorized use of property in exchange for the State dismissing other charges. But Millard told the jury she was "shocked" that the State charged her criminally because an investigator for the state auditor had told her that she not a subject of the investigation and "they didn't think I had done anything wrong." Later, she testified that her convictions were expunged and the Accountancy Board reinstated her CPA license.

*ii.    Millard's experts*

**{¶46}** John Rothwell testified in Millard's defense as an expert in charter school operations. During Rothwell's testimony, the State stipulated that, beginning in 2005, CCPA student test scores outperformed the average test score for Ohio community schools and the average test scores for all Ohio schools from 2006 to 2012.

**{¶47}** The trial court deemed Jonathan Libbert, a retired CPA with experience as an auditor, controller, forensic accountant, and fraud examiner as an expert in forensic accounting and certified fraud examination. Libbert testified that the State's audit team "clearly made up some of the standards" for the audit "as they went along." Libbert denied the special audit's findings for recovery involved public funds. In a report, Lippert identified $307,000 in CCPA revenue from private sources from April 2006 to June 2009, which was more than double the special audit's findings during the same period.

4. CCPA disputed its duty to indemnify Millard

**{¶48}** At trial, Ronnie Gore, the CCPA Board chair, testified that Millard was "in charge of taking care of all of our finances, writing checks, paying our bills." Millard was CCPA's financial "gatekeeper" and was tasked with ensuring that CCPA expenditures were approved for a proper public purpose within the relevant rules and regulations. The CCPA Board relied on Millard "to report any misspending." And the CCPA Board "leaned and depended on [Millard as the] Treasurer to make sure that she only paid the expenses that we approved."

**{¶49}** Gore testified that Millard failed to perform her duties, citing her approval of purchase orders "that w[ere] not approved by the board." In his view, she was not acting with "the [level] of responsibility [he expected] as a Treasurer." Gore discussed the discrepancies between the salaries approved by the CCPA Board for Millard and Hamm and what they were actually paid. Millard and Hamm were "overpaid by thousands of dollars." When the CCPA Board approved funds for trips, he expected CCPA staff to spend within that approved amount. But Millard never informed the CCPA Board when trip expenses exceeded the approved budget. Gore identified a litany of unapproved purchases and expenses listed in the audits.

18

{¶50} According to Gore, Millard and Hamm grew "very close" and he believed that their relationship was "why [Millard was] . . . approving these expenses when she knew they were not an expense that the Board had [] approved." He believed that relationship explained why Millard never reported Hamm's spending to the board.

{¶51} When the CCPA Board discovered the state of CCPA's finances in February 2013, it suspended Millard. During her suspension, the CCPA Board asked Millard to assist it in accessing federal and state funding. Three days later, the CCPA Board held an emergency meeting because funds had been transferred out of an account and CCPA was going to "be short in running payroll." Gore suspected that Millard transferred those funds. CCPA fired Millard because of what the state auditor uncovered, the indictments, and Millard's guilty pleas. Gore testified that Millard did not ask the CCPA Board to indemnify her. Yet, the CCPA Board independently "chose not to indemnify [] Millard" because she "did not act in good faith or reasonable belief as in the best interest of the school" and the CCPA Board "had reasonable cause to believe her conduct was unlawful." The CCPA Board reported Millard to the ODE.

{¶52} At one point, Gore found a copy of CCPA Board minutes that he believed were "altered" and made to "look like [the CCPA board] had approved particular expenses." Gore shared those documents with the prosecutor's office and the state auditor's office. Gore also "found a whole bunch of" doctored minutes and a three-year employment contract for Hamm that signed by Millard, but not approved by the CCPA Board, with a clause that Hamm could not "be fired."

**E. The jury found Millard liable**

{¶53} The jury found Millard liable for a statutory finding for recovery and for the unauthorized disbursement of $392,847 of public money. Further, the jury determined that CCPA did not breach its contract when it did not indemnify Millard.

19

The trial court entered judgment against Millard for $392,847 and granted CCPA's motion for a directed verdict against Millard on her promissory-estoppel claims.

## II. Analysis

**{¶54}** In six assignments of error, Millard challenges several aspects of her trial. First, she argues that the trial court should have granted her motion for judgment on the pleadings on her immunity claim. Second, she maintains that the trial court should have entered a directed verdict in her favor based on immunity and should have allowed Millard to present an immunity defense. Third, she argues that the trial court should have granted her motion for summary judgment because the statute of limitation barred the State's claims and because the underlying audit was invalid. Fourth, she contends that the trial court erred when it took judicial notice of this court's opinion in *Millard* and admitted evidence related to Millard's expunged criminal record. Fifth, she claims that the trial court committed multiple errors when it rejected her proposed jury instructions. And sixth, she argues that the trial court improperly allowed Blakesley to testify as an expert.

## A. Millard timely appealed all issues she raises in this appeal

**{¶55}** As a threshold matter, CCPA argues that Millard's first assignment of error—challenging the trial court's denial of her motion for judgment on the pleadings—amounts to an untimely appeal of that decision because it was a final, appealable order. And because she failed to appeal that decision, CCPA argues that we lack jurisdiction to consider her challenge.

**{¶56}** Our jurisdiction is limited to "appeals that are timely filed." *Keybank Natl. Assn. v. Hogan Elec. Co. LLC*, 2023-Ohio-935, ¶ 13 (8th Dist.). Within 30 days of a trial court entering a final order, a party must file a notice of appeal of that order. *See* App.R. 4(1)(a). A party who fails to file a timely notice of appeal of an order waives

any assignment of error related to that order. *See In re Harris,* 2003-Ohio-672, ¶ 10 (1st Dist.), citing *In re Tamara*, 2002-Ohio-1270 (8th Dist.).

**{¶57}** Under R.C. 2744.02(C), a trial court order "den[ying] . . . an employee of a political subdivision the benefit of an alleged immunity from liability as provided in [R.C. Ch. 2744] or any other provision of law is a final order." As used in R.C. Ch. 2744, the word "law" means "any provision of the constitution, statutes, or rules of the United States or of this state." R.C. 2744.01(D). So, "R.C. 2744.01(D) and 2744.02(C) render the denial of immunity afforded under state or federal law a final, appealable order." *Summerville v. City of Forest Park*, 2010-Ohio-6280, ¶ 15. The parties do not dispute that CCPA was a political subdivision under R.C. 2744.01(F) or that the trial court denied Millard immunity when it rejected her claim under R.C. 3133.25(B)(1) and denied her motion for judgment on the pleadings.

**{¶58}** The issue is, as Millard correctly points out, that orders denying immunity to an *employee* of a political subdivision are final orders and immediately appealable. R.C. 2744.02(C). Millard maintains that she could not appeal the trial court's rejection of her motion for judgment on the pleadings because she was not an employee. An employee is "an officer . . . whether or not compensated or full-time or part-time, who is authorized to act and is acting within the scope of the officer's . . . employment for a political subdivision." R.C. 2744.01(B). But R.C. 2744.01(B) plainly states that an "independent contractor" is not an "employee."

**{¶59}** We agree with Millard that she could not appeal the trial court's decision under R.C. 2744.02(C). While the amended complaint alleged that "Millard was an officer and/or authorized representative of CCPA between July 1, 2005 and March 18, 2013," the special audit attached to the complaint unequivocally identified her as an

independent contractor. Indeed, some findings for recovery were predicated on Millard's status as an independent contractor.

**{¶60}** Because the record established Millard as an independent contractor, Millard could not immediately appeal the trial court's decision denying her motion for judgment on the pleadings and we have jurisdiction to consider Millard's six assignments of error.

## B. The trial court correctly denied Millard's motions for judgment on the pleadings and a directed verdict

**{¶61}** Millard's first two assignments of error assert that the trial court erroneously denied her motions for judgment on the pleadings and for a directed verdict. In both assignments, she asserts that R.C. 3313.25 shielded her from liability.

1. <u>Judgment on the pleadings and directed verdicts</u>

**{¶62}** We review the trial court's decisions to deny Millard's motions for judgment on the pleadings and a directed verdict de novo. *See Morelia Group-De, LLC v. Weidman*, 2023-Ohio-386, ¶ 15 (1st Dist.); *see also Bunta v. Superior VacuPress, L.L.C.*, 2022-Ohio-4363, ¶ 19. A judgment on the pleadings is proper if, after construing the allegations in the complaint as true, the trial court "'finds, beyond doubt, that the plaintiff can prove no set of facts that would entitle the plaintiff to relief.'" *Id.*, quoting *Vandercar v. Port of Greater Cincinnati Dev. Auth.*, 2022-Ohio-3148, ¶ 40 (1st Dist.). Similarly, a trial court may direct a verdict in one party's favor when, after construing the evidence presented at trial in favor of the nonmoving party, it finds that on any "determinative issue reasonable minds could come to but one conclusion . . . and that conclusion is adverse to" the nonmoving party. Civ.R. 50(A)(4).

2. R.C. 3313.25(B)(1) does not shield Millard from liability

**{¶63}** Our analysis begins with the statutory text. R.C. 3313.25(B)(1) states that "[a] treasurer shall not be held liable for a loss of public funds when the treasurer has performed all official duties required of the treasurer with reasonable care, but shall be liable only when a loss of public funds results from the treasurer's negligence or other wrongful act." When reading a statute, our "primary concern is legislative intent." *Cincinnati City School Dist. Bd. of Edn. v. State Bd. of Edn. of Ohio*, 2008-Ohio-1434, ¶ 14 (1st Dist.).

**{¶64}** Millard insists that R.C. 3313.25(B)(1)'s protections extend to her because her contracts with CCPA, the audits, and the complaint all refer to her as CCPA's treasurer. The State contends that the statute, when read as a whole, shields public school district treasurers from liability and does not apply to Millard.

**{¶65}** We agree with the State that R.C. 3313.25(B)(1) does not shield Millard from liability despite references to her to as the CCPA treasurer, because "the label 'treasurer' is less important than the character of the position." *Cordray v. Internatl. Preparatory School*, 2010-Ohio-6136, ¶ 29. While Millard's reading of the statute is not inconsistent with a reading of the statutory text in isolation, "statutory language cannot be construed in a vacuum." *Davis v. Michigan Dept. of the Treasury*, 489 U.S. 803, 809 (1989); *see Time Warner Cable v. City of Cincinnati*, 2020-Ohio-4207, ¶ 11 (1st Dist.). Statutes must be read "in their context and with a view to their place in the overall statutory scheme." *Davis* at 809.

**{¶66}** Reading R.C. 3313.25 as a whole and in the context of R.C. Ch. 3313, the word "treasurer" refers to a treasurer of a school district board of education. The word "treasurer" in R.C. 3313.25(B)(1) follows the bonding requirement for "the treasurer of each board of education." R.C. 3313.25(A). That matters, because a "'word is known

23

by the company it keeps.'" *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000), quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). And the rest of R.C. Ch. 3313 reveals that "treasurer" is not as broad as Millard suggests. A "treasurer" is "the chief fiscal officer of the *school district*." (Emphasis added.) R.C. 3313.31(A). By contrast, community schools are "independent of any school district." R.C. 3314.01(B).

**{¶67}** Plus, the General Assembly shielded treasurers from liability in the statutory section titled "Bond of treasurer of board" and the chapter governing "Boards of Education." *See* R.C. 3313.25; *see also* R.C. Ch. 3313; *Cincinnati City School Dist. Bd. of Edn. v. Conners*, 2012-Ohio-2447, ¶ 8 ("The General Assembly has provided for Ohio's boards of education under R.C. Chapter 3313"). While not determinative, "statutory titles and section headings '"are tools available for the resolution of a doubt about the meaning of a statute."'" *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008), quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002), quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998).

**{¶68}** Unlike a school district governed by a board of education, community schools must employ "a designated fiscal officer." R.C. 3314.011(A). When the legislature drafts a statute and employs words that have "acquired a particular meaning," we presume that the legislature was intentional with the statutory language. *See Vossman v. Airnet Sys., Inc.*, 2020-Ohio-872, ¶ 14. And significantly, "R.C. 3314.04 exempts community schools from the rules governing boards of education set forth in R.C. Chapter 3313." *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 18. While R.C. Ch. 3314.04 identifies several exceptions to R.C. Ch. 3313's exemption, the General Assembly did not include R.C. 3313.25 as one of the statutes applicable to community schools.

**{¶69}** In sum, R.C. 3313.25(B)(1)'s protections do not apply to Millard and others employed by a community school. The trial court appropriately denied Millard's motions for judgment on the pleadings and a directed verdict. We overrule Millard's first and second assignments of error.

**C. The trial court properly denied Millard's summary-judgment motion**

**{¶70}** Millard argues in her third assignment of error that the trial court erroneously denied her motion for summary judgment. She asserts (1) the State's claims were barred by the statute of limitations; and (2) the State's audits were invalid.

**{¶71}** Under Civ.R. 56(C), summary judgment should be granted if "(1) 'there is no genuine issue as to any material fact,' (2) 'the moving party is entitled to judgment as a matter of law,' and (3) 'reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.'" *State ex rel. Ohio AG v. Peterson*, 2021-Ohio-4124, ¶ 16 (8th Dist.), quoting *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978). We review a trial court's summary-judgment decision de novo, which "requires . . . an independent review of the evidence before the trial court without deference to the trial court's decision." *Dornette v. Green Bldg. Consulting LLC*, 2025-Ohio-4944, ¶ 20 (1st Dist.).

1. <u>The State is exempt from generally-worded limitations statutes</u>

**{¶72}** The State sued Millard to recover public money. Count 1 claimed Millard was liable under the State's findings for recovery contained in the audits performed under R.C. 117.28, 117.30, and 117.36. Count 2 asserted that Millard was strictly liable under R.C. 9.39. Millard argues that the State's claims were barred by R.C. 23095.07's six-year limitation period because the state auditor filed the special audit with ODE on May 15, 2013, and the State did not file its complaint until June 14, 2019.

**{¶73}** Once the state auditor completes and certifies an audit report, the state auditor must provide a "certified copy" of the audit report to various stakeholders. A certified copy must be filed with "the clerk of the legislative authority, clerk of the governing body, executive officer of the governing body, and chief fiscal officer of the audited public office." R.C. 117.26. If the audit report includes findings for recovery, the statutory scheme ensures that the attorney general receives a certified copy of the audit report and notice of the actions that other offices take in response. First, a certified copy must be filed "with the officer required . . . to act as legal counsel to the officers of the public office . . . [or] the prosecuting attorney of the county within which the fiscal office of the public office is located." R.C. 117.28. If that office elects to sue to recover misappropriated funds identified in the audit report, the attorney general may "appear in any such action . . . in conjunction with or independent of the officer." *Id.* If the office does not sue, the officer must notify the attorney general within 120 days. *Id.* But also, "a certified copy of the report shall be filed with the attorney general." R.C. 117.30. All of this is to say, "the General Assembly anticipated multiple methods for the attorney general to sue regarding a wayward community school" and provided "multiple arrows in [the state auditor's] quiver" to recover misappropriated public funds. *Value Learning*, 2021-Ohio-2008, at ¶ 30, 34 (1st Dist.).

**{¶74}** But these statutes "'do[] not fix a time limitation within which suit must be brought.'" *State ex rel. Holcomb v. Walton*, 66 Ohio App.3d 751, 756 (12th Dist. 1990), quoting *Cleveland v. Legal News Publishing Co.*, 110 Ohio St. 360, 365-366 (1924) (construing R.C. 117.28's statutory predecessor). Ohio courts have held that "[t]he appropriate limitation period is the six years specified by R.C. 2305.07." *Id.; see Peterson*, 2021-Ohio-4124, at ¶ 34 (8th Dist.). That statute provides, in relevant part, that "[a]n action upon liability created by statute other than a forfeiture or penalty

statute shall be brought within six years after the cause of action accrued." R.C. 2305.07(B).

{¶75} The trial court denied Millard's summary-judgment motion because it found that R.C. 2305.07's six-year statute of limitations did not apply to the State. The Supreme Court of Ohio "has on a number of occasions held that the state of Ohio is not subject to the general requirements of statutes of limitations unless the statute in question has specifically included the government by its terms." *State v. Sullivan*, 38 Ohio St.3d 137, 139 (1988). The *Sullivan* Court held that "the state of Ohio, absent express statutory provision to the contrary, is exempt from the operation of a generally worded statute of limitations." *Id.* at 140. The *Sullivan* Court agreed with the Supreme Court of Pennsylvania, which held that "'the great public policy of preserving public rights, revenues and property from injury and loss'" justifies the exemption. *Id.* at 140, quoting *Commonwealth, Dept. of Transp. v. J. W. Bishop & Co.*, 497 Pa. 58, 64 (1981). Relying on *Sullivan,* the Eighth District has held that R.C. 2305.07 is "generally worded and, therefore, do[es] not apply to the state." *State ex rel. Petro v. Pure Tech Sys.*, 2015-Ohio-1638, ¶ 33 (8th Dist.).

{¶76} Millard contends that *Sullivan* should not apply to the State's complaint in this case because "the doctrine is premised on the Old English ideal of royal privileges," citing *State v. Karl R. Rohrer Assocs.*, 2018-Ohio-65 (5th Dist.). But *Rohrer* addressed Ohio's statute of repose, which is "is not a statute of limitations but rather a declaration of when a cause of action no longer exists." *Id.* at ¶ 35.

{¶77} Millard also argues that applying *Sullivan* to R.C. 2305.07(B) makes R.C. 117.34 meaningless. R.C. 117.34 provides that a cause of action accrues when "the report is filed with the officer or legal counsel whose duty it is to institute civil actions for enforcement." But *Sullivan* held that the exemption "does not extend to townships,

counties, school districts or boards of education, and other subdivisions of the state, nor, at least in some cases, to municipalities." *Sullivan* at 139. And recall that R.C. 117.27 instructs the state auditor to file a certified copy of an audit report "with the officer required by state law, municipal or county charter, or municipal ordinance to act as legal counsel to the officers of the public office." In turn, the officer receiving that certified copy of the audit report has 120 days to file a "civil action in the proper court in the name of the public office to which the public money is due." R.C. 117.27. The statutory scheme plainly contemplates local governments suing to recover misappropriated public funds. *See Vinton Cty. Agricultural Soc. v. McNally*, Franklin C.P. No. 12 CV 1398, 2012 Ohio Misc. LEXIS 6295, *1 (Oct. 26, 2012) ("Vinton County Agricultural Society [] filed this action, pursuant to R.C. § 117, et seq . . . seeking the recovery of $43,550.50."). So, exempting the State from R.C. 2305.07(B) under *Sullivan* does not render R.C. 117.34 inoperative.

{¶78} While Millard insists that *Sullivan* "should have no application in this case," *Sullivan* is binding precedent that requires Ohio courts to determine whether a statute of limitations is plainly worded. If the answer is yes, the State is exempt. Millard makes no argument that R.C. 2305.07(B) is not plainly worded. Millard has not carried her burden of demonstrating no issue of material fact and that she is entitled to judgment as a matter of law. *See Reo v. Lindstedt*, 2020-Ohio-6674, ¶ 80 (11th Dist.). We agree with the trial court and the Eighth District that R.C. 2305.07(B) is a plainly-worded statute, and the State is exempt under *Sullivan*.

{¶79} Alternatively, the State argues that its complaint fell within R.C. 2305.07(B)'s six-year statute of limitations. But because we have already determined that the State was not bound by R.C. 2305.07(B)'s limitation period, we decline to address that argument.

2. Arguments involving audit standards are moot or harmless

**{¶80}** Millard also contends that the trial court erroneously denied her motion for summary judgment when it rejected her claim that the special audit's findings for recovery were invalid. She argues that the state auditor failed to conduct annual audits of CCPA and "made up [its] own standards," rendering those finding invalid.

**{¶81}** But her argument fails because "any error in the denial of a motion for summary judgment will often be rendered moot or harmless when the trial proceedings show that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion for summary judgment was made." *Bliss v. Manville*, 2022-Ohio-4366, ¶ 14; *see William Powell Co. v. OneBeacon Ins. Co.*, 2020-Ohio-5325, ¶ 23 (1st Dist.). *Bliss*'s general rule, however, does not apply if the court denied summary judgment based on "a pure question of law." *Id.*, citing *Continental Ins. Co. v. Whittington*, 1994-Ohio-362, ¶ 23-24.

**{¶82}** The trial court denied Millard's summary-judgment motion because "there are genuine issues of material fact as to compliance with R.C. 117.11." And the evidence at trial showed that a genuine issue of material fact existed involving the audits' validity, making the validity of the audits in the trial court's denial of summary judgment moot or harmless. As a result, we overrule the third assignment of error.

## D. Millard invited any error involving her expunged convictions

**{¶83}** In her fourth assignment of error, Millard argues that the trial court erred when it took judicial notice of this court's opinion in *Millard* and then admitted evidence of Millard's expunged criminal convictions.

**{¶84}** We review the trial court's decision to admit evidence and take judicial notice for an abuse of discretion. *State ex rel. Harris v. Bruns*, 2023-Ohio-2344, ¶ 21. To prove that the trial court abused its discretion, Millard must show that its decisions

"result[ed] from an attitude that is unreasonable, arbitrary, or unconscionable." *Id.* Of course, a trial court lacks discretion to make an error of law. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 39. Moreover, we will not reverse the trial court's decision to take judicial notice or admit evidence unless Millard demonstrates that the trial court made an error that affected a "substantial right." Evid.R. 103(A); *see Setters v. Durrani*, 2020-Ohio-6859, ¶ 22 (1st Dist.).

**{¶85}** To defend against Millard's claim that CCPA breached its contract by refusing to indemnify her, CCPA asked the trial court to take judicial notice of this court's "judicial findings" in *Millard* and admit evidence of her convictions. Under CCPA Code § 6, art. VI, CCPA was under no obligation to indemnify Millard if the CCPA Board found that (1) her actions constituted "willful or wanton misconduct in the performance of the duty," (2) she did not "act[] in good faith in what [she] reasonably believed to be the best interest" of the school, and (3) she "had [] reasonable cause to believe that [her] conduct was unlawful."

**{¶86}** In *Millard*, Millard appealed the Ohio accountancy board's unanimous decision to revoke her CPA certificate. *Millard*, 2017-Ohio-7677, at ¶ 12 (1st Dist.). There, we recounted how Millard was charged with felony offenses ranging from theft in office, unauthorized use of property, and tampering with evidence. *Id.* at ¶ 2. She later pleaded guilty to two counts of unauthorized use of property. *Id.* at 4. We affirmed her license revocation because she was convicted for offenses that "involved elements of dishonesty or fraud." *Id.* at ¶ 21.

**{¶87}** The trial court granted CCPA's requests and took judicial notice of *Millard*. The trial court also mused that evidence of her convictions would be admissible solely for the "indemnification" issue.

**{¶88}** Millard argues that her convictions were expunged and therefore "never happened." She cites R.C. 2953.34(I), (K), and (L) for the proposition that disclosing sealed or expunged records can rise to a misdemeanor criminal offense. And she points out that "[w]hen a statutory provision imposing a mandatory obligation has specifically enumerated exceptions, a court does not have discretion to create additional exceptions." *State v. Vanzandt*, 2015-Ohio-236, ¶ 15. Relying on that principle, the *Vanzandt* Court held that, "because R.C. 2953.53(D) expressly prohibits access to sealed records for purposes other than those specifically listed in the statute's enumerated exceptions, [] those exceptions should not have been expanded through the exercise of judicial discretion in this case." *Id.*

**{¶89}** We assume without deciding that the trial court erroneously took judicial notice of *Millard* because Millard opened the door and waived any argument involving the admissibility of her criminal records.

**{¶90}** True, expungement means "[t]o destroy, delete, and erase a record as appropriate . . . so that the record is permanently irretrievable." R.C. 2953.31(B)(2)(b). But while R.C. 2953.34 requires deletion of "official records" of a conviction, the phrase "official records" does not include "[r]ecords, reports, or audits maintained by the auditor of state pursuant to Chapter 117 of the Revised Code." R.C. 2953.34(A)(3)(c). And "[t]he auditor of the state may provide to or discuss with other parties investigatory work product maintained under Chapter 117 of the Revised Code by the auditor of the state." R.C. 2953.34(K)(1)(d). Plus, if "the auditor of state or a prosecutor maintains records, reports, or audits of an individual . . . convicted of an offense based upon the records, reports, or audits of the auditor of state," the state auditor or prosecutor "shall not be compelled by court order to seal or expunge those records." R.C. 2953.43(E).

**{¶91}** But more to the point, Millard opened the door to the admission of otherwise inadmissible evidence. Millard claimed that CCPA breached its contract when it did not indemnify her. And during her opening statement, Millard remarked that the attorney general and "prosecutor passed" on criminally prosecuting Millard.

**{¶92}** In Ohio, """"[i]f one party offers evidence that is otherwise inadmissible as being irrelevant under the rules of evidence, the courts will consider that a waiver of the rules and in fairness allow the opposing party to present testimony or evidence on the same point."""" *Poteet v. MacMillan*, 2022-Ohio-876, ¶ 42 (12th Dist.), quoting *State v. A.W.M.*, 2020-Ohio-4707, ¶ 71-81 (10th Dist.), quoting *State v. Dunbar*, 2008-Ohio-2033, ¶ 31 (8th Dist.). A party may open the door to otherwise inadmissible evidence in "voir dire or their opening statements, even though such discussions and statements are not considered evidence." *Id.* This includes inadmissible evidence of a conviction. *See State v. Hootman*, 2019-Ohio-607, ¶ 53 (5th Dist.) (prior conviction for domestic violence was admissible after defendant testified about his criminal record, and "[a] court will not find error 'when the defense opens the door to otherwise inadmissible evidence.'").

**{¶93}** When Millard told the jury that the prosecutor chose not to charge Millard with criminal offenses for her conduct involving CCPA funds, Millard opened the door and invited any error in the admission of her expunged convictions. So, even if the trial court's judicial notice of *Millard* was error, that error was harmless. Therefore, we overrule Millard's fourth assignment of error.

**E. The trial court properly rejected Millard's proposed jury instructions**

**{¶94}** Turning to her fifth assignment of error, Millard argues that the trial court erred when it refused to give the jury her proposed instructions.[1] First, she argues that the trial court erred when it refused to give her instructions "of various revised code sections dealing with how audits should be performed, and the role of the sponsor." Second, she argues that it should have instructed the jury that R.C. 3313.25 applied. Finally, she argues that the trial court erred when it failed to instruct the jury that an auditor must defer to decisions of a school unless the decision was "palpably and manifestly arbitrary and incorrect."

1. Jury instructions in Ohio

**{¶95}** We "'review a trial court's decision granting or denying a proposed jury instruction for an abuse of discretion.'" *Jones v. Durrani*, 2024-Ohio-1776, ¶ 29 (1st Dist.), quoting *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 65 (1st Dist.). Yet, "'whether a jury instruction is legally correct and factually warranted is [a question of law] subject to de novo review.'" *Id.*, quoting *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 22.

**{¶96}** A trial court must provide a requested jury instruction in the form proposed so long as the instruction "is linked to the parties to the action and which correctly states the law applicable and pertinent to one or more of the issues of the case and upon a subject which has not been covered by other special instructions before argument." *Pickering v. Cirell*, 163 Ohio St. 1, 3 (1955). A jury instruction "should state *clearly and concisely* the issues of fact and the principles of law

---

[1] Millard's brief fails to lay out the law governing jury instructions. We take this opportunity to remind parties that the appellant "bears the burden of constructing the legal arguments necessary to support their assignments of error." *City of Shaker Hts. ex rel. Lake v. City of Shaker Hts.*, 2024-Ohio-3007, ¶ 25 (8th Dist.).

necessary." (Emphasis added.) *Id.* A jury instruction should be clear, correct, and "'complete in itself.'" *Id.*, quoting *Scott, Admr., v. Hy-Grade Food Prods. Corp.*, 131 Ohio St. 225 (1936), paragraph one of the syllabus. A trial court is under no mandatory duty to give a requested instruction that is "'indefinite, uncertain or ambiguous, or otherwise misleading.'" *Id.*, quoting *Hy-Grade* at paragraph one of the syllabus.

2. Millard's proposed instructions

**{¶97}** Millard asked the trial court to read the following jury instructions:

### R.C. 9.39 Liability for Public Money

All public officials are liable for all public money received or collected by them or by their subordinates under color of office. All money received or collected by a public official under color of office and not otherwise paid out according to law shall be paid into the treasury of the public office with which the public official is connected to the credit of a trust fund and shall be retained there until claimed by its lawful owner.

### R.C. 117.11 Annual, biennial, and early audits.

. . . [T]he auditor of state shall audit each public office at least once every two fiscal years. The auditor of state shall audit a public office each fiscal year if that public office is required to be audited on an annual basis pursuant to "The Single Audit Act of 1984," 98 Stat. 2327, 31 U.S.C.A. 7501 et seq., as amended. In the annual or biennial audit, inquiry shall be made into the methods, accuracy, and legality of the accounts, financial reports, records, files, and reports of the office, whether the laws, rules, ordinances, and orders pertaining to the office have been observed, and whether the requirements and rules of the auditor of state have been complied with. Except as otherwise provided in this division

34

or where auditing standards or procedures dictate otherwise, each audit shall cover at least one fiscal year. If a public office is audited only once every two fiscal years, the audit shall cover both fiscal years.

(B) In addition to the annual or biennial audit provided for in division (A) of this section, the auditor of state may conduct an audit of a public office at any time when so requested by the public office or upon the auditor of state's own initiative if the auditor of state has reasonable cause to believe that an additional audit is in the public interest.

(C)(1) The auditor of state shall identify any public office in which the auditor of state will be unable to conduct an audit at least once every two fiscal years as required by division (A) of this section and shall provide immediate written notice to the clerk of the legislative authority or governing board of the public office so identified. Within six months of the receipt of such notice, the legislative authority or governing board may engage an independent certified public accountant to conduct an audit pursuant to section 117.12 of the Revised Code.

(2) When the chief fiscal officer of a public office notifies the auditor of state that an audit is required at a time prior to the next regularly scheduled audit by the auditor of state, the auditor of state shall either cause an earlier audit to be made by the auditor of state or authorize the legislative authority or governing board of the public office to engage an independent certified public accountant to conduct the required audit. The scope of the audit shall be as authorized by the auditor of state.

### R.C. 117.19 Rules for generally accepted or governmental auditing standard

The auditor of state shall establish and define by rule generally accepted or governmental auditing standards, including procedures for post-audit conferences with officials of the public office audited.

### R.C. 117.28 Action upon a certified audit

Where an audit report sets forth that any public money has been illegally expended, or that any public money collected has not been accounted for, or that any public money due has not been collected, or that any public property has been converted or misappropriated, the officer receiving the certified copy of the report pursuant to section 117.27 of the Revised Code may, within one hundred twenty days after receiving the report, institute civil action in the proper court in the name of the public office to which the public money is due or the public property belongs for the recovery of the money or property and prosecute the action to final determination. The auditor of state shall notify the attorney general in writing of every audit report which sets forth that any public money has been illegally expended, or that any public money collected has not been accounted for, or that any public money due has not been collected, or that any public property has been converted or misappropriated and of the date that the report was filed.

Within one hundred twenty days after receiving the certified copy of the report, the officer receiving the report shall notify the attorney general in writing of whether any legal action has been taken. If no legal action has been taken, the officer shall, within the same

period, notify the attorney general in writing of the reason why legal action has not been taken. The attorney general or his assistant may appear in any such action on behalf of the public office and may, either in conjunction with or independent of the officer receiving the report, prosecute an action to final determination. The attorney general may bring the action in any case where the officer fails to do so within one hundred twenty days after the audit report has been filed.

### R.C. 3314.02

"Sponsor" means the board of education of a school district or the governing board of an educational service center that agrees to the conversion of all or part of a school or building under division (B) of this section, or an entity listed in division (C)(1) of this section, which has been approved by the department of education and workforce to sponsor community schools or is exempted by section 3314.021 or 3314.027 of the Revised Code from obtaining approval, and with which the governing authority of a community school enters into a contract under section 3314.03 of the Revised Code.

### R.C. 3314.019

A community school's sponsor shall communicate with the auditor of state regarding an audit of the school or the condition of financial and enrollment records of the school, and shall maintain a presence at any and all meetings with the auditor of state regardless of whether the sponsor has entered into an agreement with another entity to perform all or part of the sponsor's oversight duties.

### R.C. 3314.082

A community school shall be considered a school district and its governing authority shall be considered a board of education for the purpose of applying to any state or federal agency for grants that a school district may receive under federal or state law or any appropriations act of the general assembly. The governing authority of a community school may apply to any private entity for additional funds.

### R.C. 3314.04

Except as otherwise specified in this chapter and in the contract between a community school and a sponsor, such school is exempt from all state laws and rules pertaining to schools, school districts, and boards of education, except those laws and rules that grant certain rights to parents.

### R.C. 3301.074. Licenses for school district treasurers and business managers (prior to 2013)

(A) The state board of education shall, by rule adopted in accordance with Chapter 119. of the Revised Code, establish standards for licensing school district treasurers and business managers, for the renewal of such licenses, and for the issuance of duplicate copies of licenses. Licenses of the following types shall be issued or renewed by the board to applicants who meet the standards for the license or the renewal of the license for which application is made:

(1) Treasurer, valid for serving as treasurer of a school district in accordance with section 3313.22 of the Revised Code;

(2) Business manager, valid for serving as business manager of a school district in accordance with section 3319.03 of the Revised Code.

(B) Each application for a license or renewal or duplicate copy of a license shall be accompanied by the payment of a fee in the amount established under division (A) of section 3319.51 of the Revised Code. Any fees received under this section shall be paid into the state treasury to the credit of the state board of education licensure fund established under division (B) of section 3319.51 of the Revised Code.

(C) Any person employed under section 3313.22 of the Revised Code as a treasurer on July 1, 1983, shall be considered to meet the standards for licensure as a treasurer and for renewal of such license. Any person employed under section 3319.03 of the Revised Code as a business manager on July 1, 1983, shall be considered to meet the standards for licensure as a business manager and for renewal of such license.

(D) Any person applying for or holding any license pursuant to this section is subject to sections 3123.41 to 3123.50 of the Revised Code and any applicable rules adopted under section 3123.63 of the Revised Code and sections 3319.31 and 3319.311 of the Revised Code.

3. <u>The trial court properly rejected Millard's proposed instructions</u>

**{¶98}** The trial court rejected Millard's proposed instructions because her instructions were "longer than they need to be." It pointed out that the standard Ohio Jury Instructions generally "take[] excerpts from such things and applies them directly to the case" so that the instructions "would be much more focused for the benefit of the Jury." In contrast, Millard's instructions were "too long and too unfocused for the benefit of the Jury." And it found that some of her instructions were "not relevant."

**{¶99}** We agree with the trial court. Millard's proposed jury instructions were neither clear nor concise. Afterall, statutory language is, at times, "inartful." *See Hartley v. Berlin-Milan Local School Dist.*, 69 Ohio St.2d 415, 418 (1982) (Holmes, J., concurring in judgment). And her proposed jury instructions were not complete. Some of her statutory language referenced other statutory provisions that were not included in her proposed jury instructions. Moreover, her proposed jury instructions risked confusing the jury. Therefore, the trial court did not abuse its discretion when it rejected Millard's proposed jury instructions.

4. The trial court's indemnification jury instruction

**{¶100}** Millard also challenges the trial court's indemnification jury instruction. Generally speaking, "[a] cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41. Indemnification is an issue grounded in contract "'and is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement.'" *Ayers v. City of Cleveland*, 2020-Ohio-1047, ¶ 22, quoting *Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 240 (1987). Like a claim for breach of contract, "'[t]he burden is on the party seeking indemnity to prove that he or she is entitled to it.'" *MTGLQ Investors, L.P. v. City of Youngstown*, 2006 U.S. Dist. LEXIS 11315, *11-12 (N.D. Ohio Mar. 17, 2006), quoting *Heritage Mut. Ins. Co. v. Stevens*, 92 Ohio Misc.2d 9 (C.P. 1996), citing *Cameron Mut. Ins. Co. of Missouri v. Bouse*, 635 S.W.2d 488 (Mo.App. 1982); *see S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc.*, 183 F.Supp.3d 197, 228 (D.Mass. 2016) (collecting federal and state

cases and explaining that the party "bringing the indemnity claim [] ha[s] the underlying burden to establish the elements of the claim at trial.").

**{¶101}** The trial court instructed the jury that:

Express indemnification is based on a written contract in which one party, the indemnitor, promises to indemnify another party, the indemnity [sic], or [sic] payments it makes under a set of circumstances set forth in the contract. In order to find in favor of Stephanie Millard in her claim for indemnification, you must find a contract existed in which CCPA agreed to indemnify Stephanie Millard.

. . .

Before you can find for Stephanie Millard on her breach of contract claim, you must find by the greater weight of the evidence that Stephanie Millard and CCPA entered into an agreement[,] that CCPA breached the agreement, and that Stephanie Millard substantially performed her duties under the agreement at the time of the CCPA breach.

. . .

In order to find in favor of Stephanie Millard, you must also find that she established that, 1, she is not guilty of willful or wanton misconduct in the performance of her duties to CCPA. And, 2, she acted in good faith in what she reasonably believed to be the best interest of CCPA.

If you find by the greater weight of the evidence that Stephanie Millard proved her claim, then you must further decide whether CCPA breached or caused her to suffer any damages.

If you find by the greater weight of the evidence that Stephanie Millard failed to prove any part of her claim, then you must find for CCPA.

**{¶102}** We hold that the trial court's jury instructions accurately reflect the principle that the party claiming a breach of a contract's indemnification provision has the burden of proving that breach.

**{¶103}** Finding no error in the trial court's jury instructions and rejection of Millard's proposed jury instructions, we overrule her fifth assignment of error.

**F. Blakesley's improper expert testimony was harmless**

**{¶104}** Finally, Millard insists in her sixth assignment of error that the trial court erred by allowing Blakesley to testify about the CCPA audits findings and why he concluded that Millard's actions were improper.

1. Expert and lay-witness testimony

**{¶105}** We will reverse the trial court's decision to admit evidence if we find "both an abuse of discretion and proof of material prejudice." *Garry v. Borger*, 2023-Ohio-905, ¶ 25 (1st Dist.), citing *Ijakoli v. Alungbe*, 2022-Ohio-2423, ¶ 26 (1st Dist.). Material prejudice means that the decision affected a party's substantial right. *Id.*, citing Evid.R. 103(A). Specifically, the evidentiary decision "'must have "affected the final determination of the proceeding."'" *Id.*, quoting *Ijakoli* at ¶ 29, quoting *Buckmaster v. Buckmaster*, 2014-Ohio-793, ¶ 23 (4th Dist.).

**{¶106}** An expert witness is a person "'qualified by knowledge, skill, experience, training, or education to provide a scientific, technical, or other specialized opinion about the evidence or a fact issue.'" *State v. Fread*, 2013-Ohio-5206, ¶ 14 (12th Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004).

**{¶107}** In contrast, lay-witness testimony must be based on the witness's "personal knowledge of the matter." Evid.R. 602. In Ohio, lay witnesses may "provide opinion testimony in limited circumstances, based on personal observation and perceptions, even if the witness could otherwise qualify as an expert." *State v. Greene*, 2025-Ohio-1096, ¶ 55 (6th Dist.). Lay-witness testimony may "'embrace[] the ultimate issue to be decided by the trier of fact'" without violating the Rules of Evidence. *State v. Infante*, 2020-Ohio-992, ¶ 42 (11th Dist.), quoting *State v. Heilman*, 2006-Ohio-1680, ¶ 96 (11th Dist.), citing Evid.R. 704. At bottom, if "'"testimony is based on recited personal observations, a non-expert can express opinions about myriad topics."'" *State v. Mathis*, 2019-Ohio-3654, ¶ 58 (8th Dist.), quoting *State v. Scheffield*, 2017-Ohio-2593, ¶ 66 (11th Dist.), quoting *State v. Morris*, 8 Ohio App.3d 12, 17 (8th Dist. 1982).

2. <u>Any error in the admission of Blakesley's testimony was harmless</u>

**{¶108}** Millard points out that, while the trial court allowed Blakesley to testify as a lay witness, his testimony veered into expert testimony. Specifically, she contends that Blakesley provided expert testimony when he explained that community schools are public offices, community schools receive funding that otherwise would have gone to a traditional school district, the state auditor has the ability to audit community schools, the audit's objectives, what he meant by saying that the audit team "tested" the objectives of the audit, the fieldwork that goes into an audit, an audit's compilation process, and the use of guidelines in the audit.

**{¶109}** The trial court allowed Blakesley to testify, as an employee of the auditor's office that conducted the audit, about "why and how they do the audit without being an expert."

**{¶110}** Blakesley's testimony about his actions during the audit was based on his firsthand knowledge and was admissible as lay-witness testimony. So, the trial

court did not err when it allowed Blakesley to testify about developing the audit guidelines and testing those guidelines by reviewing CCPA's financial statements.

{¶111} But we agree with Millard that Blakesley's discussion of the nature of community schools and their funding sources went beyond lay testimony and constituted expert testimony. But these facts were established in the special audit. "A certified copy of any portion of the [auditor's] report containing factual information is prima-facie evidence in determining the truth of the allegations in the petition." R.C. 117.36. Prima facie evidence is "evidence which will support, but not require, a verdict in favor of the party offering the evidence." *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 64 (1991). So, the audit report was "'sufficient to support but not compel a certain conclusion.'" *St. Francis Home v. Ohio Dept. of Job and Family Servs.,* 2006-Ohio-6147, ¶ 30 (10th Dist.), quoting *City of Cleveland v. Keah*, 157 Ohio St. 331, 337 (1952).

{¶112} Because the audit report itself was admissible and established the information to which Blakesley testified, any error in allowing Blakesley to testify about community school funding was harmless. Therefore, we overrule Millard's sixth assignment of error.

### III. Conclusion

{¶113} We overrule Millard's six assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, P.J.**, and **CROUSE, J.,** concur.